UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (BOSTON)

UNITED STATES of AMERICA,

                                           Case No.: 1:04-cr-10119-1 MEL

      v.

JAMES R. HART,
             Defendant.

DEFENDANT'S SENTENCING MEMORANDUM

*Preliminary*

**Sentence Already Served.** Mr. Hart has already served his Guidelines sentence

of incarceration. With 28 months in pre-trial detention in Essex and Plymouth County,

this 53 year-old man with no criminal history score and no convictions should be

sentenced to time served for wire fraud. The offense of conviction is a 19-point,

Criminal History Category I, 30 - 37-month wire fraud offense. The agreed adjusted

offense level of the Plea Agreement is 19 points.

**Sophisticated Means Not Warranted.** Probation has suggested that the offense

"otherwise involved sophisticated means" and that a role adjustment under USSG

§2B1.1(b)(8) may apply (PSR ¶28). The government has joined the defense in objecting

to a role adjustment for "sophisticated means" under USSG §2B1.1(b)(8).[1] Even if the

Court were to accept the PSR's additional two-level adjustment for "sophisticated

means," leaving Mr. Hart at a 21-point offense level, CHC I for 37 - 46 months, Mr. Hart

---

[1] US Probation argues for- but the government objects to - a "sophisticated means" role
adjustment. The plea agreement at page 2, ¶3 sets forth that the parties agree to a base
offense level of six, a loss of over $400,000.00 for a 14-point adjustment and another
two-point adjustment for 10 or more victims. USSG §2B1.1(b)(2)(A) for a total offense
level of 22, less three points for acceptance (Plea Agreement, p. 3, ¶3). As Probation's
responses to objections recite, "The government has indicated to the Probation Office that
it joins in the defendant's objection to the sophisticated means enhancement." PSR, p.
31, "Response" to "Objection 8".

has served nearly the equivalent sentence when adjusting for the 54-days per year of "good time" and 3.5 months of pre-release at the last ten per cent of sentence. (POINT I, *infra.*)

**Non-Guidelines Sentence for "Not-Greater-than-Necessary" Punishment.**
Assuming, *arguendo*, that the Court were to agree with the sophisticated means enhancement (a position to which the government and the defense correctly object) and not account for pre-release, defendant requests non-Guidelines sentencing under the factors listed in 18 USC §3553(a)(2).   The individual circumstances of this case indicate that a sentence longer than the one already served would be greater than necessary to effect the purposes of the Sentencing Reform Act and therefore inconsistent with the Act. Factors warranting a non-Guidelines sentence include: (1) the statistical *un*likelihood of Mr. Hart's recidivism at age 53 with Mr. Hart's education and lack of criminal record; (2) the length of Mr. Hart's pretrial detention in the comparatively harsh conditions of Plymouth County; (3) Mr. Hart's medical condition (which now includes skin cancer under treatment (see attached letter)[2]; and (4) detention credit to avoid dead-time. (POINT II, *infra*.)

  **Credit for Time Served in Official Detention.**  Any time in state detention on charges related to the counts of the indictment should be credited as time in official detention under 18 USC §3585.  (POINT III, *infra*.)

---

[2] Counsel attaches the unsigned letter of defendant's physician.  The letter in counsel's possession appears on original letterhead and is available for inspection by the Court and the parties.

FACTS

A.    Overview

The Court may recall Mr. Hart's release from pre-trial detention after a May 18, 2006 hearing.  Mr. Hart is a 53 year-old ordained minister with no criminal history points and no convictions.  At the time of release, Mr. Hart had served 25 months at Plymouth County (PSR, Cover page, "Custodial Status").  Not reflected in the PSR, Mr. Hart had also served additional 90 days on a related out-of-state warrant before being charged and detained in this Court from January 24 to April 23, 2004.  Counsel for the defense and then-counsel for the government, AUSA Seth Berman, indicated to the Court that Mr. Hart may have served the equivalent (or according to the government, all but three weeks of the equivalent) of a Guidelines sentence on then-pending wire fraud charges.

The plea acknowledges ca. $600,000.00 in relevant conduct, ten+ victims and acknowledges a level-19 offense by subtracting three points for acceptance.  (April 5, 2007 Plea Agreement, Doc. 54.)  Mr. Hart pled guilty to count four of the superceding indictment on April 10, 2007.  The admitted criminal conduct involved soliciting, taking and keeping $62,350.00 in purchase money in July 2003 from a person in Missouri for a Porsche that Mr. Hart never delivered.  The other counts of the indictment alleged similar conduct in the time between June 1999 and October 2003.

B.    Offense Conduct

Mr. Hart conducted a business under the "d/b/a" of Sovereign Brokerage Services arranging the purchase and sale of collectible Porsches.  He began legitimate business operations in 1995 with modest success.  The voluminous records seized by various

3

police agencies from Mr. Hart indicate that Mr. Hart conducted an authentic car

brokerage business.  (Counsel believes the Secret Service has returned the records and

property in its possession.  Mr. Hart notes that boxes of paper records are missing.  These

may be in possession of local law enforcement.)

Mr. Hart's business usually involved brokering (not reselling) collectible Porsches

under the business name of Sovereign Brokerage Services.  Mr. Hart did not incorporate

in this or any other jurisdiction.  While all Porsches may look similar to the average

person, enthusiasts acknowledge a wide variety of subtle variations in chassis, body style,

power train and equipment.  Some variants are more rare or simply more desirable than

others.  Typically, Mr. Hart would contact an owner or an advertising seller of a

collectible Porsche.  Mr. Hart would then either contact persons on his list of buyers

potentially interested in the car or he would advertise (in the *Robb Report*).  Mr. Hart can

fairly attest to having satisfied and repeat customers.

The PSR faults this business information collection conduct and points to it as

evidence of "sophisticated means". (See "Probation Officer's Response to Objection #7",

PSR pp. 31 - 32.)  It may be submitted for the purposes of argument that Mr. Hart

obtained data on cars for sale without true owner permission in attempts to find a buyer

and create a brokered transaction.  This, however, is no different from other buyer's

broker conduct in a variety of industries.   Participation in the sale by the seller and buyer

is voluntary.  Mr. Hart's fee was usually in the neighborhood of $2,000.00.

Mr. Hart made no attempts at concealment.  He did business personally and

without a corporate liability shield.  He never conducted business in anything but his own

name, d/b/a *Brokerage Service*.  Curiously, Probation insists that Mr. Hart used a

corporation to conceal illegal schemes.

> …[T]here is no evidence indicating that Mr. Hart attempted to conceal his
> identity.  However, the defendant did utilize corporate identities to
> perpetrate his offense.  Those corporate identities were also utilized for
> legitimate business, thus arguably concealing his criminal activity in a
> cloud of legitimate business transactions.

PSR p. 31.  Mr. Hart never incorporated and he never held himself out as a corporation or

partnership or anything other than Jim Hart doing business as ("d/b/a") Sovereign

Brokerage Services.

The disagreement over corporate identity is more than one of mere semantics.

Had Mr. Hart pretended there was a corporation or that there were other owners or that he

was merely an employee acting for a principal, then Probation might be correct in

discussing a corporate identity.

After a few years of operations in about 1999, Mr. Hart failed to meet expenses

and fell into default with creditors.  Mr. Hart accepted funds and, instead of using them to

purchase the cars as warranted, applied them to meet general obligations of the business.

The defaulted car buyers sued Mr. Hart and obtained default judgments, often with Mr.

Hart's promise to pay.

Essex County authorities investigated Mr. Hart in 2002, but they declined to

pursue the investigation.  However, the purchaser named in count four, Mr. S., called a

contact at US Secret Service and this investigation began.  At about the same time, Mr.

Hart was indicted in two out-of-state jurisdictions and Essex County police officials

cooperated in the renewed investigation.  Mr. Hart was arrested on the out-of-state

warrants and was held in Essex County beginning January 24, 2004. (Counsel is

requesting release of this information from Essex County Sheriff's Office Records). He

was then indicted in this Court on April 14, 2004 and detained at Plymouth County from

April 21, 2004 until May 18, 2006, a total of over 28 months.

C.    Incarceration

According to counsel's calculations, Mr. Hart - who has no criminal history points

and no convictions at age 53 - should be released for time served because he has already

served the equivalent of a correctly-calculated Guidelines sentence. The 28 months he

has served in pre-trial detention and on a related interstate warrant are the equivalent of a

36 - 37-month sentence after good-time credit and the attribution of pre-release. (CHC I,

Level 19 vs. Level 21, USSG Table 5A).

|  |  | Months |
|---|---|---|
| Counsel works back from a 36-month sentence as follows: |  |  |
|  |  | 36 |
| Good time for 3 years, 3 x 54 = 162/7 days/4.3weeks |  |  |
|  |  | (5.4) |
| Pre-release, lesser of ten per cent or 6 months |  |  |
|  |  | (3.6) |
| Actual time to be served in credited BOP custody |  |  |
|  |  | 27 |

Imposing a Guidelines Sentence would require defendant's release for the 28

months of hard time Mr. Hart has already served.    Mr. Hart served 25 months in federal

pre-trial detention in the Plymouth County Correctional Facility. He also spent three

months in detention at Essex County Correctional Facility on charges for the same

conduct set forth in the six counts of the indictment. (See, 18 USC §3585 concerning

credit for time in official detention.) These 28 months of "hard time" in pre-trial

detention are the equivalent of a 36-month BOP sentence.

Defendant emphasizes that he served his time under far harsher conditions than those he would have served in the US Bureau of Prisons.   In all likelihood, this Court would have recommended and the Bureau of Prisons would have designated Mr. Hart to a Federal Prison Camp for service of his sentence.  Reference to the BOP's classification manual indicates that Mr. Hart would have received a "minimum" security classification and designation to a Federal Prison Camp.  See, Program Statement No. P5100.08 (09/16/2006),  Inmate Security Designation and Classification Manual.  Under Chapter Four of the Manual's security classification point system, Mr. Hart scores as follows:

| | |
|---|---|
| Eligible for self-surrender | (-3) |
| Severity of Current Offense (Lowest) | (0) |
| Criminal History Score | (0) |
| History of violence | (0) |
| History of escape | (0) |
| Type of Detainer - "None" | (0) |
| Age        36 - 54 | (2) |
| Education - "Verified HS Degree" | (0) |
| Drugs/ETOH Abuse - "None" | (0) |
| Security Point Total | -1 |

No "Public Safety Factors"

Instead of serving time in a federal institution where Mr. Hart could have participated or served in educational programs, Mr. Hart sat in county jails known for providing no inmate services, bad food and inadequate medical care.

ARGUMENT

POINT I:
"SOPHISTICATED MEANS"
NOT PRESENT


The Guidelines commentary and case law discussion show that the "sophisticated

means" adjustment recommended by Probation is not warranted.  As Commentary Note 7

to the November 2003 Guidelines §2B1.1(b)(8), provides, the cited subsection "C" is

used only for "especially complex or especially intricate offense conduct pertaining to the

execution or concealment of the offense.

> 7. *Sophisticated Means Enhancement under Subsection (b)(8)*.—
>
> *(A) Definition of United States.—For purposes of subsection (b)(8)(B), "United States" means each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa.*
>
> *(B) Sophisticated Means Enhancement.—**For purposes of subsection (b)(8)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.** For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.*


Central to the notion of "sophisticated means" is conduct involving a complex

undertaking to avoid detection by the victim of the crime (so the crime can be better

committed) or to avoid detection and capture by law enforcement.  While this Circuit has

not issued an opinion explaining the Commission's rationale on the cited section of the

8

Guidelines, §2B1.1(b)(8)(C), the Second Circuit has[3]:

> This commentary states: [T]his amendment provides an increase for fraud
> offenses that involve conduct, such as sophisticated concealment, that
> makes it difficult for law enforcement authorities to discover the offense or
> apprehend the offenders. The new enhancement provides a two-level
> increase and a "floor" offense level of level 12 in the fraud guideline and
> replaces the current enhancement for "the use of foreign bank accounts or
> transactions to conceal the true nature or extent of fraudulent conduct."
> There are three alternative provisions to the enhancement. The first two
> prongs address conduct that the Commission has been informed often
> relates to telemarketing fraud, although the conduct also may occur in
> connection with fraudulent schemes perpetrated by other means.
> Specifically, the Commission has been informed that fraudulent
> telemarketers increasingly are conducting their operations from Canada and
> other locations outside the United States. Additionally, testimony offered at
> a Commission hearing on telemarketing fraud indicated that telemarketers
> often relocate their schemes to other jurisdictions once they know or
> suspect that enforcement authorities have discovered the scheme. Both
> types of conduct are specifically covered by the new enhancement. **The
> third prong provides an increase if any offense covered by the fraud
> guideline otherwise involves sophisticated concealment. This prong
> addresses cases in which deliberate steps are taken to make the offense,
> or its extent, difficult to detect.** U.S.S.G. app. C (2003)

*United States v. Kostakis*, 364 F.3d 45, fn. 3 (2d Cir. 04/02/2004)(applying the de novo

standard of review & reversing departure; finding defendant's conduct "rather

---

[3] By using the term as a computer search query for the period January 1, 1987 to July 24,
2007, counsel finds five First Circuit decisions (one of them unreported) discussing
"sophisticated means". They contain no guidance on applying the adjustment:  See, *US v.
Gillman,* 478 F.3d 440 (1 Cir. March 8, 2007) upholding sophisticated means in
sentencing of investment adviser who "abused his position and the trust that his clients
placed in him by illegally and fraudulently diverting investors' funds from the domestic
securities … [and hiding] those actions from his clients by periodically issuing false
account statements assuring them that their money was invested and appreciating as
promised."  See, also *US v. Veilleux*, 40 F.3d 9 (1st Cir. 1994)(argument not preserved
for appeal and not addressed); *US v. Brennick*, 134 F.3D 10 (1st Cir. 1998)(mentions
USSG §2T1.1 "sophisticated means" re tax fraud but does not discuss);  *US v. Pizarro-
Berrios*, 448 F.3d 1 (1st Cir. 2006)(mentioned but not reached because of remand for
further determination of relevant conduct); [U] *US v. Lascola*, 45 Fed.Appx. 5 (1st Cir.
2002)(unreported; refusing to allow defendant appellant to "resurrect" double counting
argument re sophisticated means not preserved below).

sophisticated" effort at *concealment* for false entries in two oil record books on thirty

separate occasions; defendant routinely instructing subordinates to dump oily water

directly into the sea at night; falsified entries having numerous technical components

made with the purpose of deceiving the Coast Guard).

The adjustment is applied on a fact-based inquiry and is reviewed *de novo* with

deference to this Court on appeal. *US v. Lewis*, 93 F.3D 1075 (2d Cir. 08/28/1996)(case

of first impression of "sophisticated means" §2T1.1 in Second Circuit, applying same

standard as used in this and other Circuits).

Like the Second Circuit, the primary cases construing "sophisticated means are

from the area of tax crimes, but likewise instructive.

> Sophisticated means are those which are more complex than those
> involved in the run-of-the-mill tax evasion case. *US v. Furkin*, 119 F.3d
> 1276, 1284 (7th Cir. 1997). The Guidelines specifically include the use of
> corporate shells in an exemplary list of sophisticated means. U.S.S.G. §
> 2T1.1 cmt. n.4. See also *US v. Newell*, 239 F.3d 917, 921 (7th Cir.
> 2001)….. The sophisticated means enhancement does not require a
> brilliant scheme, just one that displays a greater level of planning or
> concealment than the usual tax evasion case. *US v. Kontny*, 238 F.3d 815,
> 821 (7th Cir. 2001) ("In light of its purpose and context, we think
> 'sophistication' must refer not to the elegance, the 'class,' the 'style' of the
> defrauder-the degree to which he approximates Cary Grant-but to the
> presence of efforts at concealment that go beyond . . . the concealment
> inherent in tax fraud."); *US v. Minneman*, 143 F.3d 274, 283 (7th Cir.
> 1998); *US v. Madoch*, 108 F.3d 761, 766 (7th Cir. 1997).

*US v. Fife*, 471 F.3d 750 (7th Cir. 2006).

Mr. Hart's crime was committed in accepting a purchaser's escrowed money and

applying it to pay his expenses and creditors and without then-present or future ability to

pay to purchase the car for the buyer.  Typically, a far grater level of effort and

sophistication is required to support sophisticated means than is present in this case, e.g.,

a mortgage fraud conspiracy that included the creation of false bank documents; the

solicitation and creation of false appraisals; the creation of false blueprints; submission of

false blueprints to town officials in order to inflate the assessment of comparable home

values; collusion with the attorney representing many of the purchasers at closing; and

other tactics designed to conceal the scheme.  See, *US v. Amico,* 416 F.3d 163 (2d Cir.

07/26/2005).   The adjustment may be justified by as elaborate, coordinated series of step

to carry out the scheme; even if each step in the scheme was not elaborate, the total

scheme was sophisticated in the way all the steps were linked together to exploit different

vulnerabilities in different systems in a coordinated.  *US v. Jackon*, 346 F.3d 22 (2d Cir.

10/01/2003) citing  *US v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996) (holding, in tax case,

that sophisticated means enhancement applied even when "each step in the planned tax

evasion was simple, [because] when viewed together, the steps comprised a plan more

complex than merely filling out a false tax return").


POINT II:
NON-GUIDELINES SENTENCE IS
WARRANTED TO FULFILL PURPOSES
OF SENTECING REFORM ACT


The 28 months Mr. Hart has already served under harsh county lock-up conditions

is more than sufficient to serve the purposes of the Sentencing Reform Act, 18 USC

§3553(a).  Mr. Hart has never been convicted of any other offense nor has he ever had to

make an admission to sufficient facts. He is now 53 years old and an unlikely recidivist.

He has served hard time under difficult conditions of incarceration.  He requires

treatment for skin cancer and is undergoing neurological testing for a possible tumor,

making further incarceration (likely a return to Plymouth County) especially onerous.

This Court now has great latitude in fashioning a just sentence that promotes respect for the law, protects the public and deters others from committing crimes. See, 18 USC §3553(a)(2). Such a sentence need not include an incarceration as recommended by the Guidelines.[4]

As this Court has heard from every defendant since January 13, 2005, *United States v. Booker*, 543 U.S. 220 (2005), held that judicial determinations of fact not found by a jury or admitted by the defendant to increase sentences under the Federal Sentencing Guidelines violate the Sixth Amendment. As a remedy, the Supreme Court excised 18 U.S.C. § 3553(b), the presumption in favor of the Guidelines range and it excised 18 U.S.C. § 3742(e), designed to enforce the Guidelines (*de novo* review.

Central to any *Booker* analysis is the "Parsimony Provision". The new mandatory principle is a limiting one: The sentence must be "**sufficient, but not greater than necessary**," to fulfill "(2) the need for the sentence imposed –"

    a)to reflect the seriousness of the offense, to promote respect for the law, and to

       provide just punishment for the offense;

    b)to afford adequate deterrence to criminal conduct;

    c)to protect the public from further crimes of the defendant;

    d)to provide the defendant with needed educational or vocational training, medical

       care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2) (emphasis supplied).

Courts across the spectrum have recognized that they must honor the parsimony

---

[4] For this section, counsel cites *passim* THE CONTINUING STRUGGLE FOR JUST, EFFECTIVE AND CONSTITUTIONAL SENTENCING AFTER *UNITED STATES v. BOOKER,* Amy Baron-Evans, Esq., August 2006.

provision.  See, e.g., *United States v. Spigner*, 416 F.3d 708, 711 (8ᵗʰ Cir. 2005); *United States v. Gray*, 362 F.Supp.2d 714, 717 (S.D. W. Va. 2005) (Goodwin, J.); *United States v. Angelos*, 345 F.Supp.2d 1227, 1240 (D. Utah Nov. 16, 2005) (Cassell, J.)(whose opinion the day after Booker warned that the Guidelines remained as before the measure of a reasonable sentence.

     With the Guidelines themselves advisory, there are factors the court "shall consider" in determining a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing:

1. "the nature and circumstances of the offense" and "the history and characteristics of the defendant"
2. "the kinds of sentences available"
3. the advisory guidelines
4. "any pertinent policy statement" in the Guidelines Manual, which     includes departures
5. "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"
6. "the need to provide restitution to any victims of the offense"


     The Guidelines do not have presumptive weight.  As the United States Supreme Court ruled less than five weeks ago:

> Given our explanation in Booker that appellate 'reasonableness' review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review."  Id. at *9.  There is no "legal presumption that the Guideline sentence should apply.

*Rita v. United States,* 2007 WL 1772146 (June 21, 2007).  A failure to consider 3553(a) factors in the case, is a mandatory guidelines sentence and thus violates both the Sixth Amendment and *Booker's* remedial interpretation of the sentencing statute.  See *United States v. Crosby*, 397 F.3d 103, 114-15 (2d Cir. 2005) (mandatory application of the guidelines is error if based on judge found facts, or if based on jury-found facts); *United*

*States v. Williams*, 372 F. Supp.2d 1335 (M.D. Fla. May 5, 2005) (government shows

disrespect for law in continuing to advocate that the guideline sentence is the only

reasonable sentence, contrary to Booker and separation of powers).

Post-Booker cases illustrate that the Court may consider formerly discouraged

factors, or facts that would not have met pre-Booker standards for departure, to impose a

lower sentence. See, e.g., *United States v. Antonakopoulos*, 399 F.3d 68 (1st Cir. 2005)

(that defendant was caretaker for brain damaged son may be considered under 3553(a)

though there were alternative means of care and thus not ground for departure); *United

States v. Haidley*, 400 F.3d 642, 645 (8th Cir. Mar. 16, 2005) (that defendant used

embezzled money for her child's high medical expenses, and her "family situation, which

included two young children at home" (neither of which rose to the level of departure)

were both "factors which can be considered under 3553(a)(1) ('the nature and

circumstances of the offense and the history and characteristics of the defendant')."").

In addition to Mr. Hart's subjective individual circumstances, studies published

by the US Commission in 2004 and 2005 demonstrate objectively that a Guidelines

sentence is not needed. According to these studies, the Guidelines exclude considerations

that predict a reduced risk of recidivism or an increased likelihood of rehabilitation, and

include factors that increase the criminal history score but have no predictive value or

overstate the risk of recidivism. Mr. Hart would "score" well were he tested under most

of the indicators mentioned in the reports of the Commission:

Age:   [Not discussed here. At age 28, Mr. Hart has no criminal history.]

Employment: Stable employment in the year prior to arrest is associated with a lower
risk of recidivism.5   [Mr. Hart has long worked as an itinerant minister.]

---

5 *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing
Guidelines* (May 2004) (hereinafter "Measuring Recidivism"),

Education:  Recidivism rates decrease with increasing educational level (no high school, high school, some college, college degree).6  [Mr. Hart has a college level education and has credits for graduate education.]

Family:  Recidivism rates are lower for defendants who are or were ever married, even if divorced.7  [Mr. Hart has not married.  He is, however, a long time member of a church community and has family like ties to members of the congregation, e.g., Jonas Robertson.

Gender:  Women recidivate at a lower rate than men.8 [true]

Abstinence from drug use:  Recidivism rates are lower for those without illicit drug use in the year prior to the offense.9 [No history for drugs or alcohol.]

Rehabilitation and Education:  Drug treatment programs and educational opportunities would have a high cost-benefit value.10 [not relevant]


Non-Violent Offenders:  Offenders sentenced under the fraud, larceny and drug guidelines are the least likely to recidivate.11  [Mr. Hart is non-violent]

Uncounted crimes of violence:  The predictive power of U.S.S.G. § 4A1.1(f) is statistically insignificant.12  [not relevant]

Minor offenses: [no offense history]

---

http://www.ussc.gov/publicat/Recidivism_General.pdf; *Recidivism and the First Offender* (May 2004) (hereinafter "First Offender"), http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf; *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4, 2005) (hereinafter "Salient Factor Score"), http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.   at 12 & Exhibit 9. at 12 & Exhibit 10.

[6] *Id*.

[7] *Id*.

[8] *Id*. at 11 & Exhibit 9.

[9] *Id*. at 13 & Exhibit 10.

[10] *Id*. at 15-16.

[11] *Measuring Recidivism, supra* note 32, at 13 & Exhibit 11.

[12] *Salient Factor Score, supra* note 32, at 7, 11, 15.

15

POINT III:
CREDIT PRIOR CUSTODY IN OFFICIAL DETENTION

Essex County Correctional Center records reflect that Mr. Hart served 89 days in official detention from January 23, 2004 to April 21, 2004.  He served that time under an out-of-state fugitive warrant relating to one of the transactions in this case.  In determining whether Mr. Hart should receive a credit-for-time-served sentence, the Court should anticipate that the Bureau of Prisons would credit Mr. Hart for the time he was detained in Essex County on a related state-court warrant.  Under 18 USC §3585(b)(2)

> (b) Credit for prior custody.--A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences--…(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence.

If the Court were sentencing Mr. Hart to a period of incarceration, the Court would not ordinarily have discretion to account for non-federal time served; the matter would be left to the US Bureau of Prisons.[13]  Here, however, Mr. Hart could be left to serve a term of months and allowed to self-report.  At that time, the BOP would calculate whether Mr. Hart had served his sentence or whether he should report for additional time.

---

[13]  See, e.g., *Rogers v. US*, 180 F.3d 349 (1st Cir. 06/17/1999) ("it is well-established that a request for credit for prior custody under 18 U.S.C. § 3585(b)(2) must be made, in the first instance, to the Attorney General through the Bureau of Prisons upon imprisonment after sentencing. See *US v. Wilson*, 503 U.S. 329, 334 (1992) ("[Section] 3585(b) does not authorize a district court to compute the [presentence detention] credit at sentencing."). Once administrative remedies are exhausted, see 28 C.F.R. §§ 542.10-542.16, prisoners may then seek judicial review of any jail-time credit determination, see *Wilson,* 503 U.S. at 335, by filing a habeas petition under 28 U.S.C. § 2241.)

The more efficient practice would be to account for the defendant's "dead time"

on an out-of-state warrant now by an exercise of this Court's discretion under USSG

§5G1.3 and *Booker.*  Accounting for "dead time" presently would better achieve the aims

of the Sentencing Reform Act.  As USSG §5G1.3 provides:

> (a) If the instant offense was committed while the defendant was serving a
> term of imprisonment ….
> ( b) If subsection (a) does not apply, and a term of imprisonment resulted
> from another **offense that is relevant conduct to the instant offense of
> conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3)
> of §1B1.3 (Relevant Conduct) and that was the basis for an increase in
> the offense level for the instant offense under Chapter Two (Offense
> Conduct) or Chapter Three (Adjustments), the sentence for the
> instant offense shall be imposed as follows**:
> (1) **the court shall adjust the sentence for any period of imprisonment
> already served on the undischarged term of imprisonment if the court
> determines that such period of imprisonment will not be credited to
> the federal sentence by the Bureau of Prisons**; and…

CONCLUSION

For the reasons set forth above, defendant's requests for relief should be granted.

Dated this 24th day of July, 2007 at Boston, Massachusetts.

/s./*Kevin L. Barron*
Kevin Lawrence Barron 550712
Attorney for James R. Hart
453 Washington Street 5B
Boston, MA 02111-1325
Tel. No. 617-482-6368
Fax: 617-517-7711
Email: k@lawyerbarron.com

CERTIFICATE OF SERVICE

I hereby certify that these documents filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic
Filing.

/s./*Kevin L. Barron*
Kevin Lawrence Barron 550712